### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                                      **NO. 12-265**

**ROBERT KALUZA  AND**
**DONALD VIDRINE**                                    **SECTION "K"(5)**

### ORDER AND REASONS

Before the Court are the following three motions:

1)  Defendant Robert Kaluza's Motion to Dismiss Counts 1-22 (Rec.Doc. 51), joined by
    Defendant Donald Vidrine;
2)  Defendant Robert Kaluza's Motion to Dismiss Counts 12-22 (Rec.Doc. 52), joined by
    Defendant Donald Vidrine; and
3)  Defendant Donald Vidrine's Motion to Dismiss Counts 12-22 (Rec.Doc. 54).

These motions arise out of the government's prosecution of two employees of British Petroleum

("BP") who were on board the *Deepwater Horizon* drilling vessel during the explosion on April

20, 2010, which killed eleven members of the vessel's crew.  On November 14, 2012, a federal

grand jury in the Eastern District of Louisiana returned a Second Superseding Indictment ("the

Indictment") charging each of the employee-defendants, Robert Kaluza and Donald Vidrine

("defendants"), with eleven counts of Involuntary Manslaughter under 18 U.S.C. § 1112

("Section 1112") (Counts 1-11), eleven counts of Ship Officers' Manslaughter under 18 U.S.C. §

1115 ("Section 1115") (Counts 12-22), and one count alleging a Clean Water Act violation under

33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3) (Count 23).  (Superseding Indictment ¶¶ 25-70).

On November 28, 2012, both defendants plead not guilty as to all counts.  The defendants

filed the instant motions on May 30, 2013 and May 31, 2013, respectively, moving the Court to

dismiss Counts 1-22.  On September 18, 2013, the Court held oral argument on the issues

presented by the motions.  Considered conjointly, defendants' motions present several arguments

1

supporting the dismissal of Counts 1-22 for failure to charge an offense and lack of jurisdiction. (Rec. Doc. 51, at 1).  In essence, defendants contend that the indictment fails to charge an offense and the court lacks jurisdiction as to Counts 1-22 because no federal statute extends federal law to the Outer Continental Shelf ("OCS") where the defendants were employed on *Deepwater Horizon*, and defendants also contend that the indictment fails to charge an offense under Section 1115 as to Counts 12-22 as the terms of the statute do not apply to the defendants.

More specifically, the jurisdictional issue consists of two separate arguments involving two primary statutes.  First, defendants argue that the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333(a)(1), does not extend federal laws to the OCS where the *Deepwater Horizon* was located or any actions that occurred thereon; therefore, the government may not charge the defendants under the federal laws, Sections 1115 and 1112.  Second, defendants argue in the alternative that, as to Section 1112 only, 18 U.S.C. § 7 ("Section 7") does not extend jurisdiction to the *Deepwater Horizon* or the actions occurring thereon as the *Deepwater Horizon* is not a United States vessel within the "special maritime jurisdiction" under Section 7.  Finally, provided jurisdiction does exist, the defendants allege that the government fails to charge an offense under Section 1115, arguing that by its plain language the statute does not apply to the defendants.  Specifically, defendants contend that Section 1115, which applies to "captains, engineers, pilots, and other persons employed on any… vessel," does not apply to the defendants, who were employed for non-marine drilling-related purposes.  18 U.S.C. § 1115.

Because both defendants' motions are issue-driven and coterminous, the Court will analyze the merit of the parties' arguments by the issues presented.  In addition, because the jurisdictional arguments naturally precede any other argument regarding applicability of the statute to the facts at hand, the Court will address the issues in the following order, *in seriatim*:

(1) whether OCSLA Section 1333(a)(1) extends federal laws to the *Deepwater Horizon* on the OCS; (2) whether 18 U.S.C. § 7 provides jurisdiction so as to charge defendants under Section 1112; and (3) if jurisdiction exists, whether Section 1115 applies to the defendants.

Having considered all foregoing motions, memoranda, exhibits, and oral argument on the issues presented therein, the Court finds for the following reasons that follow that the defendants' Motion to Dismiss Counts 1-22 for lack of jurisdiction under OCSLA § 1333(a)(1) will be denied and that the defendants' Motion to Dismiss Counts 12-22 for failure to charge an offense under 18 U.S.C. § 1115 will be granted.

## I.    LEGAL STANDARD

Rule 12(b)(2) of the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Further, the court may hear a claim at any time that "the indictment or information fails to invoke the court's jurisdiction or to state an offense." FED. R. CRIM. P. 12(b)(3)(B). The court is required to take the indictment's allegations as true when determining whether the indictment fails to state an offense. *United States v. Rainey* 2013 WL 2181285 (E.D. La. May 20, 2013). The indictment must provide a "plain, concise, and definite written statement of the essential facts constituting the offense." FED. R. CRIM. P. 7(c)(1). An indictment must allege "each material element of the offense" to be sufficient; otherwise the indictment's "failure to charge an offense constitutes a jurisdictional defect." *United States v. Cabrera-Teran*, 168 F.3d 141, 143 (5th Cir. 1999). This requirement ensures that the indictment satisfies "minimal constitutional standards," *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999), enabling the grand jury to find "probable cause that the defendant has committed each element of the offense…as required by the Fifth Amendment." *Cabrera-Teran*, 168 F.3d at 143.

3

However, the law does not require a "ritual of words," and, while the indictment must allege each element of the offense, the court's consideration of "[t]he validity of an indictment is governed by practical, not technical considerations."  *Crow*, 164 F.3d at 235 (citation omitted) (internal quotation mark omitted).

In addition, in considering whether to grant the motion to dismiss the indictment based on its sufficiency, "the propriety of granting a motion to dismiss the indictment under Rule 12 'is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact.'" *United States v. Rainey*, No. 12-291, 2013 WL 2181285, at *5 (E.D.La. May 20, 2013) (citing *United States v. Flores*, 404 F.3d 320, 324 (5th Cir.2005).  In the Fifth Circuit, questions of law are considered appropriate for such pretrial motions.  *Id.*  In the instant matter, whether federal political jurisdiction[1] exists over a geographical location is a question of law.  *United States v. Warren*, 984 F.2d 325, 327 (9th Cir. 1993).  Likewise, the question of statutory interpretation of Section 1115 and its applicability to the defendants is an issue of law.  *Matter of Walden*, 12 F.3d 445, 448 (5th Cir. 1994).  Under Fifth Circuit precedent, the Court may make preliminary findings of fact necessary to decide the question of law presented where such facts do not invade the province of the ultimate finder of fact or are undisputed.  *United States v. Flores*, 404 F.3d 320, 324 n.6, 325 (5th Cir. 2006).  Thus, the Court will begin with an iteration of those facts necessary to determine the questions of law presented to the Court.

## II.  BACKGROUND

The instant motions present issues that depend on undisputed facts regarding the nature of the *Deepwater Horizon* as a drilling vessel and the nature of the defendants' employment aboard the *Deepwater Horizon*.  In order to analyze these issues properly, a brief synopsis of the

---

[1] See *infra* note 45 for an explanation of "political jurisdiction" as referred to by 43 U.S.C. §1333(a)(1).

development of offshore drilling and the *Deepwater Horizon* as well as the defendants'
employment responsibilities is required.

A.      **Offshore Deepwater Drilling**

The *Deepwater Horizon*, a semi-submersible drilling vessel that drilled in 5,000 feet of
water, represents the culmination of a long history of offshore drilling advances in the Gulf of
Mexico.  Though offshore drilling existed as early as the 1890s, technological developments and
economic stability dictated the ebb and flow of the success of offshore drilling in the Gulf.[2]   In
the late 1940s, oil companies hesitated to drill exploratory wells in the Gulf from fixed platforms
as the costs outweighed the benefits of production.[3]  A "fixed platform" is generally considered a
"permanent or semi-permanent structure" that is "built on site much like a building is constructed
on land."  THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW, §3-9, at 169, n.9 (5th ed.
2011).  Yet fixed platforms provided limited utility in offshore drilling: "[m]obility in drilling
was crucial to the offshore industry's long-term viability."[4]

The need for mobility prompted the development of the first submersible drilling rig in
1954, which could be moved and submerged, resting on the floor, in up to 30 feet of water.[5]
Other companies experimented with "jack-up" rigs.[6]  A jack-up rig is towed to a location and its
extendable legs are "jacked" down to the ocean floor for support, "allowing the work area to be
raised…above the water level."  SCHOENBAUM, §3-9 at 169, n.8; PATRICK H. MARTIN & BRUCE
M. KRAMER, WILLIAMS & MEYERS: OIL AND GAS LAW, § 8-J (Lexis Nexis Matthew Bender
2013).  Submersible rigs, jack-up rigs, and (the later developed) semi-submersible rigs are

---

[2] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, DEEP WATER: THE
GULF OIL DISASTER AND THE FUTURE OF OFFSHORE DRILLING, REPORT TO THE PRESIDENT 24 (2011), *available at*
http://www.gpo.gov/fdsys/pkg/GPO-OILCOMMISSION/content-detail.html [hereinafter PRESIDENT'S REPORT].
[3] PRESIDENT'S REPORT, *supra* note 2.
[4] PRESIDENT'S REPORT, *supra* note 2.
[5] PRESIDENT'S REPORT, *supra* note 2; *see* THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW, §3-9 at 169,
n. 8 (5th ed. 2011) ("A submersible rig is a drilling structure that is submerged until it rests on the bottom.").
[6] PRESIDENT'S REPORT, *supra* note 2.

considered "movable" and therefore "floating" rigs. *See* SCHOENBAUM, §3-9 at 169, n.8; *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 417, 105 S.Ct. 1421, 1424, 84 L.Ed.2d 406 (1985) (generally offshore rigs are of two types, fixed or floating). Some twenty-three mobile units were operating in the Gulf by 1957 and were roughly five times more successful as onshore wells.[7]

Capitalizing on the trend in offshore development, OCSLA was passed in 1953, to "amend the Submerged Lands Act in order that the area in the outer Continental Shelf beyond boundaries of the States may be leased and developed by the Federal Government." H.R.REP. NO. 83-413 (1953), reprinted in 1953 U.S.C.C.A.N. 2177, 2177. Though OCSLA laid the foundations for federal regulation, the primary concern was for leasing land.[8] In 1953, the OCSLA's purpose was "to define a body of law applicable to the seabed, the subsoil, and the fixed structures…on the outer Continental Shelf." *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 355, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969). Legislators debated whether to apply federal law and state law as surrogate federal law to the OCS or whether to allow general maritime law to apply to the drilling structure on the OCS. *Id.* at 363. Ultimately, the Supreme Court determined that Congress intended federal law and not general maritime law should apply to "fixed" structures. *Id.* at 364.

However, production in the industry increasingly favored the use of floating rather than "fixed" rigs, and technological advances continued to allow the rigs to drill in ever-deeper water. In 1962, Shell Oil Company developed a new "floating drilling platform" intended to drill in depths of up to 600 feet.[9] This "semi-submersible" rig remained afloat but submerged with three

---

[7] PRESIDENT'S REPORT, *supra* note 2, at 24-25.
[8] PRESIDENT'S REPORT, *supra* note 2, at 57.
[9] PRESIDENT'S REPORT, *supra* note 2, at 25.

large columns on each side and mooring lines keeping the vessel in position.[10]   More

particularly, a semi-submersible rig is a "rig with a platform deck supported by columns which

are connected to large underwater displacement hulls or large vertical caissons or some

combination of the two," and once located on site, the columns or caissons are flooded to

stabilize the rig.[11]   Shell shared its technology with other companies, furthering development of

semi-sumbersibles and deepwater drilling.[12]   In the same year, Shell also equipped one drillship

with an automatic dynamic positioning system.[13]   By 1970, oil production peaked, and with the

OPEC oil embargo of 1973, increasing development of offshore oil reserves ensued.[14]

Meanwhile, despite the existence of OCSLA, federal regulatory oversight was relatively lax.[15]

Calamities such as the Santa Barbara blowout in 1969 called attention to the need for safety.[16]

Congress enacted a multitude of environmental laws in the 1970s, embodying a shift in focus

advancing environmental protection and policy.[17]   Though OCSLA 1953 enabled the Interior

Department to proscribe rules for prevention of "waste and conservation of natural resources,"

the focus turned from avoiding wasting the reservoir's resource to one of environmental

safeguards when Congress amended OCSLA in 1978.[18]   Among other amendments, Congress

deleted "fixed structures" and added the phrase, "all installations and other devices permanently

or temporarily attached to the seabed."  43 U.S.C. § 1333(a)(1).  Although "artificial islands and

fixed structures" sufficiently covered the types of apparatuses used to drill in the Gulf in 1953,

---

[10] PRESIDENT'S REPORT, *supra* note 2, at 25.
[11] Williams & Meyers, Oil and Gas Law (8-S).  By comparison, a semi-submersible "is a cross between a submersible and a barge [, which] is submerged about 50 feet after which anchors are lowered to complete the mooring of the rig." SCHOENBAUM, *supra* note 5, at 169, n.8 (5th ed. 2011).
[12] PRESIDENT'S REPORT, *supra* note 2, at 26.
[13] PRESIDENT'S REPORT, *supra* note 2, at 26-27.
[14] PRESIDENT'S REPORT, *supra* note 2, at 31.
[15] PRESIDENT'S REPORT, *supra* note 2, at 28.
[16] PRESIDENT'S REPORT, *supra* note 2, at 28-29.
[17] PRESIDENT'S REPORT, *supra* note 2, at 59.
[18] PRESIDENT'S REPORT, *supra* note 2, at 58, 60.

technological advances involving mobile offshore drilling rigs in the 1950s "led the 1978 Congress to broaden § 1333(a)(1) in order to assure exclusive national dominion over all types of apparatus that are used for exploiting the outer Shelf's mineral resources."[19]

With a collapse in oil prices and recessive economy in the early 1980s, many companies turned away from Gulf leasing.[20]  However, Shell Oil's discovery of a major prospect off the coast of Louisiana and subsequent success prompted other major oil companies to advance technology and production in offshore drilling.[21]  Technological breakthroughs and the promise of production furthered the wave of offshore drilling, abandoning old platforms and venturing further into "ultra-deepwater."[22]

British Petroleum (BP) entered the Gulf making a series of discoveries about prospects in deeper water in the late 1990s.[23]  With new generations of drilling vessels and advances in drilling, BP outpaced the industry and began drilling in deeper waters.[24]  Drilling in such deep waters presented greater risks, from the strong currents in the Gulf to hurricanes to the construction of longer risers and high pressures at ocean bottom.[25]  Still, the benefits outweighed the risks, and with the promise of great development in the Gulf—and with a clean record for environmental calamities—offshore deepwater drilling continued.[26]

### B.  *Drilling at Macondo*

---

[19] David W. Robertson, *The Outer Continental Shelf Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law: Correcting the Fifth Circuit's Mistakes*, 38 J. Mar. L. & Com. 487, 497-98 (2007); *see* Dean A. Sutherland, *Significant Development in Maritime Personal Injury Law*, 64 La. L. Rev. 299, 302 (2004) ("Between 1953 and 1978, the oil and gas industry created a variety of 'special purpose' vessels, including jack-up rigs and semi-submersible rigs, from which the exploration, development and production of oil and gas from the OCS could be performed.")
[20] PRESIDENT'S REPORT, *supra* note 2, at 36.
[21] PRESIDENT'S REPORT, *supra* note 2, at 36-37.
[22] PRESIDENT'S REPORT, *supra* note 2, at 41, 45.
[23] PRESIDENT'S REPORT, *supra* note 2, at 45.
[24] PRESIDENT'S REPORT, *supra* note 2, at 46.
[25] PRESIDENT'S REPORT, *supra* note 2, at 51.
[26] PRESIDENT'S REPORT, *supra* note 2, at 52.

In 2009, after the Minerals Management Service approved an exploration plan for wells in the Mississippi Canyon Block of the Gulf of Mexico, BP began to plan for the drilling of the "Macondo" well 48 miles off the coast of Louisiana.[27]  When the *Marianas,* the intended drilling rig for the Macondo, sustained damage in a hurricane, BP substituted the *Deepwater Horizon* and resumed drilling at the Macondo well on January 31, 2010.[28]  Judge Barbier summarized the description of the *Deepwater Horizon* as the following:

> [T]he *DEEPWATER HORIZON* was a dynamically-positioned semi-submersible deepwater drilling vessel. It employed a satellite global positioning device and complex thruster technology to stabilize itself. At all material times, the vessel was afloat upon the navigable waters of the Gulf of Mexico. Unlike the jack-up drilling rig in *Demette,* the *DEEPWATER HORIZON* had no legs or anchors connecting it to the seabed. Its only physical "attachment" to the wellhead was the 5,000 foot string of drill pipe. Again, this is no more of a connection than the casing that was being hammered into the seabed by the casing crew in *Demette.* The *DEEPWATER HORIZON* was practically capable of maritime transportation, and thus is properly classified as a vessel.

*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 950 (E.D. La. Aug. 26, 2011) (citations omitted).  The *Deepwater Horizon*, considered a mobile offshore drilling unit ("MODU"), employed "dynamic satellite positioning technology" connected to "directional thrusters" that allowed the vessel to maintain its place over the wellhead.[29]

As a semi-submersible, the *Deepwater Horizon* "sat atop two enormous pontoons extending 30 feet below the ocean's surface" that kept the rig stable and afloat.[30]  Once it reached the Macondo well, the *Deepwater Horizon* lowered into place a Blow-Out Preventer

---

[27] NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON OIL SPILL AND OFFSHORE DRILLING, MACONDO: THE GULF OIL DISASTER, CHIEF COUNSEL'S REPORT 25 *available at* http://www.eoearth.org/files/164401_164500/164423/full.pdf  [hereinafter CHIEF COUNSEL'S REPORT].
[28] CHIEF COUNSEL'S REPORT, *supra* note 27, at 26; (Rec.Doc. 67-1 at 12, 25).
[29] CHIEF COUNSEL'S REPORT, *supra* note 27, at 26.
[30] CHIEF COUNSEL'S REPORT, *supra* note 27, at 29.

stack ("BOP")—a five-story, 300 ton stack of preventers designed to close the well in case of emergencies—over the wellhead, which had been fixed to a marine riser.[31]   The riser extended from the drill floor on the rig down to the BOP.[32]   The BOP and marine riser make up the drilling portions of the rig, necessary to complete drilling functions.[33]   The riser was assembled section by section onboard the rig and joined with the BOP before being lowered to the seabed, where Remote Operated Vehicles attached the BOP to the wellhead.  (Rec. Doc. 67-1 at 25).  Notably, the riser remained attached and the rig maintained its location throughout the blow-out.  (Rec. Doc. 67-1 at 25).  Maintaining the location of the rig and successfully producing oil was a result of separate crews on board the *Deepwater Horizon.*

The *Deepwater Horizon* maintained a "marine crew" responsible for the operation and maintaining the location of the semi-submersible rig.[34]   Certain marine crew members, including the dynamic positioning officers, constantly monitored and directed the action of thrusters on the rig through satellite positioning technology, enabling the rig to drill over the well.[35]   If the rig drifted more than 175 feet from the center of the well, the drilling mechanism could detach the riser from the BOP to protect the well.  (Rec. Doc. 67, at 13).  The *Deepwater Horizon* also maintained a "drilling crew" made up of several BP employees.[36]   The drill crew included employment positions such as well site leader, offshore installation manager, toolpusher, chief engineer, driller, assistant driller, cementing engineer, and mudlogger.[37]

---

[31] CHIEF COUNSEL'S REPORT, *supra* note 27, at 30; (Rec. Doc. 67-1 at 25).

[32] CHIEF COUNSEL'S REPORT, *supra* note 27, at 29.

[33] *See* CHIEF COUNSEL'S REPORT, *supra* note 27, at 29-30.

[34] *See* excerpts from March 4-5, 2013 MDL Oil Spill trial testimony of Mr. Ezell, at pp. 1637-38; UNITED STATES COAST GUARD, REPORT OF INVESTIGATION INTO THE CIRCUMSTANCES SURROUNDING THE EXPLOSION, FIRE, SINKING AND LOSS OF ELEVEN CREW MEMBERS ABOARD THE MOBILE OFFSHORE DRILLING UNIT DEEPWATER HORIZON IN THE GULF OF MEXICO, April 20-22, 2010, Appendix D, p. D-3 and D-4.

[35] *See* excerpts from March 4-5, 2013 MDL Oil Spill trial testimony of Mr. Ezell, at pp. 1637-38.

[36] *See* excerpts from March 4-5, 2013 MDL Oil Spill trial testimony of Mr. Ezell, at pp. 1637-38; CHIEF COUNSEL'S REPORT, *supra* note 27, 30-33.

[37] CHIEF COUNSEL'S REPORT, Figure 3.8 *Deepwater Horizon*'s Organizational Structure, *supra* note 27, at 31.

BP, as the legal operator of the Macondo well, neither "owned the rigs that drilled Macondo nor 'operated' them in the normal sense of the word."[38]  Daily production at the Macondo involved only a few of BP's employees.[39]  BP maintained an engineering team, headed by a leader accountable for well design and supervising drilling engineers, who also designed wells and oversaw the implementation of BP's processes.[40]  In addition, BP employed a "wells team leader" who was accountable for safety and operations of the rig.[41]  BP also maintained two "well site leaders" ("WSLs"), the top BP employees on the rig, on board the *Deepwater Horizon* at all times.[42]

As the "top BP employees" on the rig, WSLs are the "company's eyes and ears" making "important decisions regarding the course of drilling operations."[43]  WSLs are responsible for supervising the implementation of BP's drilling plans and procedures.  (Superseding Indictment ¶8; Rec.Doc. 68-1, at 9).  Each WSL would split responsibility according to 12-hour shifts.[44]  WSLs are responsible for maintaining well control and conducting or assessing the validity of what is known to the industry as "negative testing" or "negative pressure testing" as described in BP's Drilling and Wells Operations Practice manual.  (Superseding Indictment ¶ 8; Rec.Doc. 68-1, at 9).  Such testing ascertains whether the cement pumped to the bottom of the well is hardened, forming an effective barrier between the well and the oil and gas reservoir.  (Superseding Indictment ¶14).  Through the testing, the WSLs monitor for pressure increase or fluid flow, which indicates that the well is not secure and that oil fluids and pockets of pressurized natural gas could be entering the well.  (Superseding Indictment ¶¶5, 15).  If oil and

---

[38] CHIEF COUNSEL'S REPORT, *supra* note 27, at 30.
[39] CHIEF COUNSEL'S REPORT, *supra* note 27, at 30.
[40] CHIEF COUNSEL'S REPORT, *supra* note 27, at 32.
[41] CHIEF COUNSEL'S REPORT, *supra* note 27, at 32.
[42] CHIEF COUNSEL'S REPORT, *supra* note 27, at 30-31.
[43] CHIEF COUNSEL'S REPORT, *supra* note 27, at 32.
[44] CHIEF COUNSEL'S REPORT, *supra* note 27, at 31.

natural gas flows from the surrounding rock into the well, known as a "kick" in the industry, the kick could cause a blowout "up the well and onto the rig" with the "potential for ignition" and explosion.  (Superseding Indictment ¶5).  Thus, the WSLs are to take appropriate precautions to ensure well control, including shutting the well and communicating with BP personnel onshore to notify them of any unusual situation.  (Superseding Indictment ¶15).

Both defendants were employed as WSLs onboard the *Deepwater Horizon* at the time of the blow-out on April 20, 2010.  (Superseding Indictment ¶1; Rec.Doc. 68-1 at 8).  Defendant Vidrine had been a WSL for more than thirty years, while Defendant Kaluza had had thirty-five years of experience in the oil and gas industry, including at least eight years as a WSL. (Rec.Doc. 68-1, at 8; Rec.Doc.54-1, at 2).  Defendant Vidrine had been working on the Macondo well onboard another rig prior to working on the *Deepwater Horizon* beginning in January of 2010.  BP sent Defendant Kaluza to work on the *Deepwater Horizon* on April 16, 2010 as a substitute for another WSL who was attending an onshore training course.  (Rec.Doc. 52-1, at 3). The Superseding Indictment alleges that on April 20, 2010, the defendants failed to follow proper protocol as WSLs, stating that defendants negligently and grossly negligently:

> failed to phone engineers onshore to advise them during the negative testing of the multiple indications that the well was not secure; failed to adequately account for the abnormal readings during the testing; accepted a nonsensical explanation for the abnormal readings, again without calling engineers onshore to consult; eventually decided to stop investigating the abnormal readings any further; and deemed the negative testing a success, which caused displacement of the well to proceed and blowout of the well to later occur.

(Superseding Indictment ¶21).  Specifically, the Superseding Indictment alleges that the negligent and grossly-negligent conduct of the defendants proximately caused the deaths of the eleven men aboard the *Deepwater Horizon*.  (Superseding Indictment ¶23).

## III.   JURISDICTIONAL BASIS

In their motions to dismiss Counts 1-22, the defendants assert that no statute or other law extends jurisdiction to the *Deepwater Horizon*, including 18 U.S.C. § 7 and OCSLA Section 1333(a)(1).  The Court notes from the outset that a finding of jurisdiction under OCSLA extending federal laws to the *Deepwater Horizon* obviates the need for the defendants' secondary jurisdictional argument under Section 7.  Since 18 U.S.C. § 7 only applies to those statutes that are within the "special maritime and territorial jurisdiction of the United States," this section only applies to Section 1112, which only applies to manslaughter occurring within that area.  18 U.S.C. § 1112.  Because OCSLA Section 1333(a)(1) has the potential to provide a jurisdictional basis for both Sections 1112 and 1115, the Court will address this argument first.

The defendants' motions filed place at issue whether OCSLA § 1333(a)(1) extends United States' laws, including Sections 1112 and 1115, to the activities occurring on the OCS on structures such as the *Deepwater Horizon*.  The statute provides the following:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be ***erected thereon*** for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State: Provided, however, that mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter.

43 U.S.C. § 1333(a)(1) (emphasis added).  While § 1333(a)(1) appears to define the scope of the "jurisdiction" of the United States, the statute more appropriately determines which structures on the OCS are subject to the laws of the United States.[45]  The Fifth Circuit has interpreted §

---

[45] *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205-06 (5th Cir. 1988) ("The word 'jurisdiction' appears in the OCSLA at several different junctures. Except in § 1349, however, the word was used by Congress as a synonym for 'sovereignty' as part of the provisions delineating the relative powers of the United States federal

1333(a)(1), providing a "situs test" to determine whether any structure on the OCS falls within the scope of the United States' "civil and political jurisdiction." *Demette v. Falcon Drilling Co., Inc.,* 280 F.3d 492, 496 (5th Cir. 2002) *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).  Parsing the language of § 1333(a)(1), the Fifth Circuit explained:

> The OCSLA applies to all of the following locations:
> (1) the subsoil and seabed of the OCS;
> (2) any artificial island, installation, or other device if
>     (a) it is permanently or temporarily attached to the seabed of the OCS, and
>     (b) it has been erected on the seabed of the OCS, and
>     (c) its presence on the OCS is to explore for, develop, or produce          resources from the OCS;
> (3) any artificial island, installation, or other device if
>     (a) it is permanently or temporarily attached to the seabed of the OCS, and
>     (b) it is not a ship or vessel, and
>     (c) its presence on the OCS is to transport resources from the OCS.

*Id.* at 496.  At issue in this matter is the second category of the *Demette* situs test.

The defendants argue that the *Deepwater Horizon* fails to meet the situs requirement under § 1333(a)(1), stating that the *Deepwater Horizon* was not "erected" on the seabed of the OCS under the Fifth Circuit's analysis of § 1333(a)(1) because it was not "raised up" or "supported by" the seabed.  (Rec.Doc. No. 5-1 at 13).  On the other hand, the Government

---

government on the one hand and the governments of other countries and of the several states on the other."); *see also Texaco Exploration & Prod., Inc. v. AmClyde Engineered Products Co., Inc*., 448 F.3d 760, 768 *amended on reh'g*, 453 F.3d 652 (5th Cir. 2006) ("The Act expressly grants subject matter jurisdiction to the federal courts over cases and controversies 'arising out of or in connection with' any operation involving the 'development' of minerals on the Outer Continental Shelf. Id. 'Development' is defined by OCSLA as 'those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered. Thus, the Act provides for federal subject matter jurisdiction over cases and controversies arising out of or in connection with any operation involving platform construction on the Outer Continental Shelf. Such federal question jurisdiction under OCSLA is, by virtue of its express statutory provision, independent of any additional maritime basis for federal jurisdiction" (citations omitted)).

contends that the *Deepwater Horizon*, which consists of the rig and any attached drilling mechanisms, was "erected" on the OCS within the meaning of § 1333(a)(1) as supported by the legislative history of the statute.  For both the defendants and the government, no case is directly on point.  The Fifth Circuit has not yet determined whether a dynamically positioned semi-submersible drilling rig like the *Deepwater Horizon* is an OCSLA situs, nor has any case interpreting §1333(a)(1) explicitly defined "erected thereon"—even when applying *Demette*'s situs test.  Thus, this Court faces a *res nova* issue and must determine whether a dynamically positioned semi-submersible drilling rig such is "erected" on the OCS and therefore is an OSCLA situs.

It is worth noting here that the Court must clarify "what" is being "erected" within the meaning of § 1333(a)(1).  In other words, under §1333(a)(1), "all installations or other device" may include some part of the various parts of the *Deepwater Horizon* semi-submersible or it may include the entire drilling mechanism.  The parties do not dispute that the rig was "attached" by its drilling mechanisms but only whether it was "erected" upon the OCS.  In oral argument, the defendants explained that there was no doubt that even the BOP was "erected" on the OCS.  However, the defendants contest that the BOP together with the marine riser and the floating rig would be "erected" on the OCS. [46]  Given that all MODUs are at some point unattached, and yet considered OCSLA situses when attached with its various parts, it is reasonable to conclude that the "situs" test applies to the drilling platform and drilling mechanisms attaching it to the OCS.[47]

---

[46] Transcript of the Oral Argument before the Honorable Stanwood R. Duval, Jr., on September 18, 2013, p. 15-16, Mr. David Gerger for Robert Kaluza: "Well, my view would be that, as you say, the test here is, is the vessel the *Deepwater Horizon* erected, not something that the *Deepwater Horizon* lowered down to the ocean floor erected. We think there's a difference. We think the pipe does not support the *Deepwater Horizon* in any sense that the word 'erected' can be used."

[47] *See* 46 C.F.R. § 10.107 (all MODUs considered "OCS facilities"); *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492, 496 (5th Cir. 2002) *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (finding that a jack-up rig was an OCSLA situs); David W. Robertson, *The Outer Continental Shelf Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law: Correcting the Fifth Circuit's Mistakes*,

Thus, the Court will conceive of the rig as one integral unit comprising the mobile platform and all of its drilling mechanisms.

Although the Fifth Circuit has formulated a "situs test" under § 1333(a)(1) and various courts have held that certain types of rigs are "erected" on the OCS, no court has authoritatively interpreted the word "erected" in § 1333(a)(1) so as to delineate the particular meaning of the word in context.  One commentator, David W. Robertson, has noted this peculiarity: "No one has pointed this out until now, but there is a potentially troublesome ambiguity in the amended § 1333(a)(1): What does 'erected' mean?"  *The Outer Continental Shelf Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law: Correcting the Fifth Circuit's Mistakes*, 38 J. MAR. L. & COM. 487, 498.  Whether the word means "raised up" and "supported by" as the defendants contend or "built" and "assembled" as the government contends, determines whether the *Deepwater Horizon*, as a dynamic positioning semi-submersible drilling rig, is an OCSLA situs under § 1333(a)(1) that is "erected" on the OCS.  An examination of the statutory language and the legislative history provide some insight into Congress' intent behind the use of the word "erected."

### A.  *Plain Meaning of "erected"*

In order to analyze properly whether the *Deepwater Horizon* is "erected" under §1333(a)(1), the Court, as always, must begin with the language of the statute.  *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("The starting point in discerning congressional intent is the existing statutory text.").  "When faced with questions of statutory construction, 'we must first determine whether the statutory text is plain and unambiguous' and, '[i]f it is, we must apply the statute according to its terms.' Asadi v. G.E.

---

38 J. Mar. L. & Com. 487, 501 ("A ship afloat at anchor might in some senses be deemed 'attached' to the seabed, but it cannot sensibly be characterized as having been 'erected' (placed) on the seabed.").

Energy (USA), L.L.C., 720 F.3d 620, 622 (5th Cir. 2013) (quoting *Carcieri v. Salazar*, 555 U.S. 379, 387, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009) (citations omitted)).  Only after we apply principles of statutory construction, including the canons of construction, and conclude that the statute is ambiguous, may we consult legislative history.  *In re Amy Unknown*, 701 F.3d 749, 759-60 (5th Cir. 2012) cert. granted in part, 133 S. Ct. 2886 (U.S. 2013) (citing *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 518–19 (5th Cir.2004)).  "For statutory language to be ambiguous, however, it must be susceptible to more than one reasonable interpretation or more than one accepted meaning."  *In re Amy Unknown*, 701 F.3d 749, 759-60 (5th Cir. 2012) c*ert. granted in part*, 133 S. Ct. 2886 (U.S. 2013). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997) (citations omitted).  Indeed, "[s]tatutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S. Ct. 2173, 2182, 124 L. Ed. 2d 402 (1993) (citations omitted); *see also In re Amy Unknown,* 701 F.3d 749, 759-60 (5th Cir. 2012) *cert. granted in part,* 133 S. Ct. 2886 (U.S. 2013).  In addition, if an interpretation of a statute would produce absurd results, it should be avoided where alternative interpretations "consistent with the legislative purpose" are available.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S. Ct. 3245, 3252, 73 L. Ed. 2d 973 (1982); *see also United States v. Female Juvenile*, 103 F.3d 14, 16-17 (5th Cir.1996) ("Axiomatic in statutory interpretation is the principle that laws should be construed to avoid an absurd or unreasonable result.")

By its plain meaning, the word "erected" may have one or more of several meanings.

Webster's Third New International Dictionary gives the verb "erect" the following definitions:

> 1.a. (1) to put up (as a building or machine) by the fitting together of materials or parts: to        cause to stand ready to use: build; (2) to fix in an upright position (as a statue, signpost,     or plaque); put up; (3) to cause to stand up or out: raise….
>
> 2. to elevate in status: to raise to a higher office or dignity….
>
> 3.a. to bring into existence as if by raising or building: set up: establish….

770 (1976).  Similarly, Black's Law Dictionary defines the verb "erect" as "1. To construct. 2. To establish."  BLACK'S LAW DICTIONARY 621 (9th ed. 2009).  The several sub-parts of the first definition given do not clearly support the defendants' interpretation of "erected" over the government's interpretation and vice versa.  While the word "erected" could mean that the installation must be "raised," causing the rig to "stand up," it could also mean that the installation should be "built" and "put up" by the "fitting together of materials or parts" to be ready for use.

Construing "erected" in light of the word "thereon" lends no further assistance in ascertaining Congress' intent.  Webster's Third New International Dictionary defines "thereon" as "1. on that: on it; 2. After or as a result of some specified thing: thereupon (archaic)."  2372 (1976).  The word "thereon" merely qualifies the verb "erected," and in the context of the statute, simply indicates that the installation or other device should be erected *on* the "subsoil and seabed" OCS, which was previously mentioned in the same statute.

Defendants contend that the term "erected" should be interpreted to mean the rig is "supported by" the OCS.  (*See* Rec. Doc. 51, at 14, 16; Rec. Doc. 79, at 5). This interpretation, the defendants argue, distinguishes the term "erected" from "attached," giving effect to the meaning of both words.  (Rec. Doc. 51, at 12; Rec. Doc. 79, at 3).  The government argues that "erected" denotes one or more of the verbs "to build or construct, or assemble, or raise upright."

18

(Rec. Doc. 67, at 24).  As the government points out, the word "erected" may mean one or *more* of the listed definitions within the context of the statute.  While "raised up" is akin to being "supported by" the ocean floor, "assembling" connotes the action of "building" or "constructing."  Thus, both parties make plausible arguments for interpretation of the word.

Because the plain meaning of the phrase "erected thereon" has one of several meanings in the context of the statute, and ostensibly provides no clear understanding of Congressional intent, the phrase is ambiguous.  "If, after application of these principles of statutory construction, we conclude that the statute is ambiguous, we may turn to legislative history."  *United States v. Kay*, 359 F.3d 738, 743 (5th Cir. 2004).  Indeed, "[o]ur analysis does not stop with the language of the statute; we must also look to "the objects and policy of the law."  *Stafford v. Briggs*, 444 U.S. 527, 536, 100 S. Ct. 774, 780, 63 L. Ed. 2d 1 (1980) (citing Brown v. Duchesne, 19 How. 183, 194, 15 L.Ed. 595 (1857)).

### B.      *Legislative History*

Based on the legislative history of § 1333(a)(1), the government contends that the meaning of the statute is clear.  The defendants deemphasize the usefulness of the legislative history in interpreting the final version of the statute as enacted.  This Court notes that legislative history is a secondary source to be used "cautiously" and is not an adequate substitute for congressional action itself.  *See Boureslan v. Aramco*, 857 F.2d 1014, 1018-19 (5th Cir. 1988) *on reh'g sub nom. Boureslan v. Aramco, Arabian Am. Oil Co.*, 892 F.2d 1271 (5th Cir. 1990) *aff'd sub nom. E.E.O.C. v. Arabian Am. Oil Co.,* 499 U.S. 244, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991) *and aff'd sub nom. E.E.O.C. v. Arabian Am. Oil* Co., 499 U.S. 244, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991).  However, "the Court has clearly held that consideration of legislative history is proper in determination of the meaning of words used in statutes even where the

19

meaning of words appears to be plain," *United States v. Scrimgeour*, 636 F.2d 1019, 1023 (5th Cir. 1981), as the Supreme Court explained:

> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words.  When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'

*United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543-44, 60 S. Ct. 1059, 1063-64, 84 L. Ed. 1345 (1940).

As previously noted, Congress enacted OCSLA, amending the Submerged Lands Act so that the Federal Government could lease and develop the area in the OCS beyond the territories of the States.[48]  In Section 1333(a)(1), the OCSLA defines the scope of the sovereignty that the Act extends to the OCS.[49] The defendants in their motion correctly pointed out that, in enacting this provision, Congress balanced the competing policies of extending federal sovereignty to allow exploration and production versus over-extending sovereignty and impinging on other sovereigns' powers.  As it was enacted in 1953, Section 1333(a)(1) read as follows:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands

---

[48] H.R. REP. NO. 83-413 (1953), reprinted in 1953 U.S.C.C.A.N. 2177, 2177.
[49] *Amoco Production Co.*, 844 F.2d at 1205-06 (5th Cir. 1988) ("The word 'jurisdiction' appears in the OCSLA at several different junctures. Except in § 1349, however, the word was used by Congress as a synonym for 'sovereignty' as part of the provisions delineating the relative powers of the United States federal government on the one hand and the governments of other countries and of the several states on the other.")

> **and fixed structures** which may be erected thereon for the
> purpose of exploring for, developing, removing, and transporting
> resources therefrom, to the same extent as if the outer Continental
> Shelf were an area of exclusive Federal jurisdiction located within
> a State….

§ 4(a)(1), 67 Stat. 462 (1953) (emphasis added).  The statute remained unchanged until 1978,

when Congress enacted several amendments to the OCSLA.  Consequently, Section 1333(a)(1)

was amended to state the following:

> The Constitution and laws and civil and political
> jurisdiction of the United States are extended to the subsoil and
> seabed of the outer Continental Shelf and to all artificial islands,
> **and all installations and other devices permanently or
> temporarily attached to the seabed,** which may be erected thereon
> for the purpose of exploring for, developing, *or producing*
> resources therefrom, *or any such installation or other device (other
> than a ship or vessel) for the purpose of transporting such
> resources,* to the same extent as if the outer Continental Shelf were
> an area of exclusive Federal jurisdiction located within a State…

43 U.S.C. § 1333(a)(1) (emphasis added).  It is clear that Congress inserted the clause "and all

installations and other devices permanently or temporarily attached to the seabed" in place of the

phrase "fixed structures."  In context, "all installations and other devices permanently or

temporarily attached" necessarily must add to the existing phrase "artificial islands" some new

and additional structures.  Further, the new clause, in comparison to the text it replaces,

evidences an intent to change and expand the scope of the structures listed in § 1333(a)(1).

Notably, Congress omitted any reference to "fixed" structures and replaced that qualifier with the

phrase "permanently or temporarily attached," sweeping in structures that would not have been

considered "fixed."  By changing the term "structures" to include "all installations or other

devices," Congress again emphasized the intent to include less permanent "structures" that are

"attached" to the OCS.

Despite its intent in adding the phrase to include other structures, Congress failed to amend any of the original text surrounding the new clause, which includes the phrase "erected thereon." In the original statute as enacted in 1953, the phrase "which may be erected thereon" qualified the terms "artificial islands and fixed structures." § 4(a)(1), 67 Stat. 462 (1953). Underlying the decision to include "all artificial islands and fixed structures" in 1953 was the concern over the application of general maritime law. Senator Condon, who introduced the bill to the Senate, noted that "[t]he committee first attempted to provide housekeeping law for the outer shelf by applying to the *structures necessary for the removal of the minerals in the area* under the maritime law of the United States." 99 Cong. Rec. 6963 (1953) (emphasis added). If OCSLA treated the fixed drilling platforms as "vessels" under the law, the operations and activities on the platforms would be addressed by general maritime law. Many objections to the use of general maritime law were made, with one Senator remarking that " 'the fixed platforms out there do not even touch the waters except for the supporting pipes or 'legs' which go through the water down into the ground. I think you can treat those platforms as *connected with the soil* and development of the soil rather than treating them as vessels.'" *Rodrigue,* 395 U.S. at 363, n.9 (quoting Senator Daniel, Hearings before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., on S. 1901 (1953), p. 22) (emphasis added). Ultimately, the committee decided against adoption of general maritime law due to its "inaptness" in addressing the variety of legal problems on board a drilling rig. *Rodrigue,* 395 U.S. at 364. According to the legislative history, the intent or purpose of including those structures in the 1953 statute was to cover structures necessary to remove minerals in the OCS that were in some way connected to the soil and not "vessels" under admiralty law.

In the context of the 1953 statute, both parties' interpretations of the word "erected" suffice: a fixed structure may be both "built" *and* "supported" by the OCS.[50]  In light of the new clause from the 1978 amendment, however, the phrase "erected thereon" now modifies structures that may only be "temporarily attached," which creates the current ambiguity.  This less than pellucid language has produced the conundrum the Court faces in the instant matter: how are "installations and other devices"—which include more than fixed structures and may be temporarily attached—"erected" on the OCS?

In 1953, a primary purpose in enacting OCSLA was to extend federal law to structures on the OCS.  In the same vein as the 1953 Congress, in 1978 Congress arguably expanded the scope of the statute to cover the new structures by including the phrase "all installations and other device permanently or temporarily attached."  Recalling that mobile offshore drilling was only just beginning to take hold in the 1950s and that "fixed structures" covered most structures in operation, the purpose of the amendment is consistent with the purpose of the 1953 OCSLA.[51]  This conclusion also comports with OCSLA's apparent purpose of governing all "activity" occurring on the OCS.[52]

Furthermore, Congress' reports offer explanations behind the amendment and elucidate the correct meaning of the word "erected."  Though the Senate Report from 1977 states without

---

[50] In *Rodrigue*, the Court recounted the history of OCSLA's passage in 1953, noting that the legislative recognized that maritime law, if not explicitly adopted, "would not apply to these stationary structures not *erected* as navigational aids." 395 U.S. at 364 (emphasis added).  The term "erected" here arguably means "built," such as the building of a light house (a navigational aid).

[51] *See Demette*, 280 F.3d at 504 n.1 (DeMoss, J., dissenting) (stating that jack-up rigs were not in operation until the late 1950s and that "fixed structures" described the current structures in use in the early 1950s).

[52] *See* 43 U.S.C. § 1349 ("[jurisdiction extends to cases and controversies] arising out of, or in connection with…any operation conducted on the Outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf.").

further explanation that "[t]he intent is clear" as to the new clause, other reports expound on the purpose of the amendment.[53]  In the House Report, the Committee states:

> Section (a) amends section 4(a)(1) of the OCS Act of 1953 by changing the term 'fixed structures' to 'and all installations and other devices permanently or temporarily attached to the seabed' and making other technical changes. It is thus made clear that Federal law is to be applicable to *all activities on all devices in contact with* the seabed for exploration, development, and production. The committee intends that Federal law is, therefore, to be applicable to activities on *drilling ships, semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other* [sic] *appurtences*, on the OCS for exploration, development, or production purposes. Ships and vessels are specifically not covered when they are being used for the purpose of transporting OCS mineral resources.

H.R. REP. NO. 95-590, at 128 (1977) (emphasis added).  Conference Reports were issued after consideration of the amendments, and both the Senate and the House Report confirm that the insertion of the new clause would be retained.  The Reports further state:

>  The intent of the managers in amending section 4(a) of the 1953 OCS Act is *technical and perfecting* and is meant to restate and clarify and not change existing law. Under the conference report language, Federal law is to be applicable to *all activities on all devices in contact with the seabed* for exploration, development, and production.

S.R. REP. NO. 95-1091, at 80 (1978) (Conf. Rep.); H.R. REP. NO. 95-1474, at 80 (1978) (Conf. Rep.).  Though the later Conference Reports do not discuss the intent behind the amendment with as much detail as did the House Report, the language of the amendment was retained and enacted in 1333(a)(1).  The very general statement that "Federal law is to be applicable to all

---

[53] As to Section 203, which contains the amendment, the Report states simply that "Section 203 amends section 4 of the OCS Act," and "[t]he intent is clear." S.R. REP. NO. 95-284, at 72 (1977). In this report, the S.9 bill at the time contained same text in the amendment as was enacted.

activities on all devices in contact with the seabed" demonstrates Congress' clear intent to expand the statute's reach to types of structures on the OCS.

At the time of the amendment, drilling technology shifted the general style of offshore drilling rigs to include more than just "fixed" types of apparatuses.[54]   Although Congress never uses any form of the verb "erect" to describe the placement of such non-fixed structures on the OCS—instead using the phrase "in contact with"—the Report is nonetheless clear.   The legislative history indicates that Congress intended to expand the scope of Section 1333(a)(1) to cover the newer technologies with the broad phrase "all installations or other devices," and likewise the term "erected" should be read broadly to include those non-fixed "installations" or "devices" necessary for the removal of minerals.   To interpret "erected" otherwise would fail to give effect to Congress' 1978 amendment in Section 1333(a)(1).   The Court has been given the mandate that, though not a "judicial license to turn an irrelevant statutory provision into a relevant one," the Court must also "'have regard to all words used by Congress, and as far as possible give effect to them.'" *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 174, 129 S. Ct. 1436, 1444, 173 L. Ed. 2d 333 (2009) (citing *Louisville & Nashville R. Co. v. Mottley,* 219 U.S. 467, 475, 31 S.Ct. 265, 55 L.Ed. 297 (1911)).   Thus, despite ambiguity in the statute, the Court is compelled to give effect to the language of the 1978 OCSLA amendment.   The Court finds that the *Deepwater Horizon*, being an "installation or other device permanently or temporarily attached to the seabed" is "erected" on the OCS for the purposes of Section 1333(a)(1).

C.      **Fifth Circuit Jurisprudence**

---

[54] *See Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972: Hearings Before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare on S. 2318, S. 525, and S. 1547*, 480-86 (1972) (diagrams of seven types of offshore drilling rigs by International Association of Drilling Contractors).

Though the Fifth Circuit jurisprudence never explicitly defines the word "erected" in cases involving § 1333(a)(1), the same cases do not conflict with the Court's interpretation as supported by the legislative history referenced above.  Since OCSLA was enacted, the Fifth Circuit has applied it to the various types of rigs, the parts of which were considered as integral to the whole.  In applying § 1333(a)(1), the Fifth Circuit has never determined whether a dynamically positioned semi-submersible rig qualifies as an OCSLA situs.  Moreover, since *Demette,* Circuit Judge DeMoss's observation remains true:

> [N]o Supreme Court decision and no Fifth Circuit decision …
> expressly discuss[es] or interpret[s] the significance of the
> statutory language change made by the 1978 Amendments to
> OCSLA regarding the deletion of 'fixed structures' and insertion
> of 'all installations and other devices permanently or temporarily
> attached to the seabed' in the definition of the situs to which
> OCSLA is to apply.

*Demette,* 280 F.3d 492, 507 (5th Cir. 2002) (DeMoss, J., dissenting).  Nevertheless, the existing precedent highlights the apparent ambiguity in the word "erected" and accords with the conclusion that "erected" should be read broadly so as to include all structures that are "attached" to the soil of OCS and producing therefrom.

The reasoning applied by the Fifth Circuit in *Demette* supports its conclusion that OCSLA Section 1333(a)(1) applies to a jack-up rig, as a vessel, because it was both attached to and "erected" on the OCS.  *Demette*, 280 F.3d at 498.  The Court described the jack-up rig as being "jacked up" at the time of the injury at issue, where "[i]ts legs rested on the outer continental shelf."  The Court then applied its situs test:

> Here, the situs requirement of section 1333(a)(1) is met. The Fal-Rig # 85 was jacked-up
> over the OCS at the time of Demette's injury. It therefore falls into the second category
> of OCSLA situses: it was a device temporarily attached to the seabed, which was erected
> on the OCS for the purpose of drilling for oil.

*Id.*

26

The court distinguished the jack-up rig at issue in that case from tender vessels, at issue in *Longmire v. Sea Drilling Corp*, and *Parks v. Dowell Division of Dow Chemical Corp.*, cases that did not "involve a floating rig, let alone a jack-up rig." *Id.* at 499.  In *Longmire v. Sea Drilling Corp.*, the drilling operation was supported by a tender, which provided crew, pumps, electrical power, and other necessary functions to support drilling; "[i]n this regard the vessel was no more than a storeroom or warehouse in relation to the drilling platform, except for the fact that it was afloat rather than affixed to the seabed." 610 F.2d 1342,  1348 (5th Cir. 1980). The *Longmire* court clarified the distinction between "fixed" and "floating" rigs, which relates to § 1333(b) for purposes of the Longshoremen's and Harbor Workers' Compensation Act.  *Id.* at 1348.  Tender vessels, the court concluded, are "not extensions of drilling rigs fixed to the seabed."  *Demette*, 280 F.3d at 499.  The *Longmire* court held that fixed platform workers were covered by OCSLA, but floating platform workers, who are covered by maritime law, were not. 610 F.2d at 1348.  Similarly, *Parks v. Dowell Division of Dow Chemical Corp*, cited the reasoning in *Longmire* in holding that the tender vessel was not an extension of the drilling platform and therefore was not covered by OCSLA.  712 F.2d 154, 157 (5th Cir. 1983) (citing *Longmire*, 610 F.2d at 1348).

Ultimately, *Demette* distinguished both *Longmire* and *Parks* noting that the tender vessel is not a true "floating rig" and would not qualify as an OCSLA situs.  *Demette,* 280 F.3d at 499. More significantly, *Demette* concluded that the jack-up rig was a "vessel."  *Id.* at 498 n.18 ("This circuit has repeatedly held that special-purpose movable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law.")  The majority noted that the use of the word "temporarily" in Section 1333(a)(1) implies that devices that "can detach from the seabed and

are capable of movement on the sea—i.e., vessels—can fall within the scope of the OCSLA." *Id.* at 498 n.19.

Judge DeMoss, in his dissent, offers the very same authorities herein cited in this opinion—the 1953 legislative history of OCSLA, *Rodrigue*, and the 1978 Amendments to OCSLA—to support his conclusion that the jack-up rig is not a "vessel" for purposes of admiralty law but is an OCSLA situs for purposes of 1333(a)(1).  *Id.* at 506-08. Judge DeMoss reasons that the jack-up rig, when "jacked-up" with legs extending to the ocean floor, is indistinguishable from a fixed platform.  *Id.* at 509.  He explains that jack-up rigs' purpose is strictly "drilling for oil and gas," and its ability to float in water and move from one site to another merely operates to save "time and expense by avoiding the dismantling and disassembly…which inevitably occurs in order to move a shore side drilling rig….originally constructed at a site in the water."  *Id.* at 509.  While the majority and Judge DeMoss disagree as to the status of the jack-up as a vessel, both agree that the jack-up qualifies as an OCSLA situs. Reasoning that the jack-up can detach from the seabed while being capable of movement on the sea or that the jack-up is the type of structure, when operating on the OCS, that Congress intended to be included under the 1978 Amendment directly applies here.  Thus, the *Deepwater Horizon*, performing largely the same function as the jack-up rig, is considered an OCSLA situs under the Fifth Circuit's reasoning.

Other Fifth Circuit opinions that more directly address the statutory language of Section 1333(a)(1) or involve semi-submersibles offer support of this conclusion.  In *United States v. Pickett*, the Fifth Circuit did not reach the issue of whether the pipe-lay barge at issue in that case was an OCSLA situs for purposes of section 1333(a)(1).  598 F.3d 231 (5th Cir. 2010). However, in her concurrence, Judge Clement noted that a rig or a platform "must be 'erected' on

the [OCS]" to be an OCSLA situs and concluded that the pipe-lay barge was akin to a tender, which is not "erected" on the OCS.  *Id.* at 236.  Judge Clement cites to *Demette* in stating that a jack-up rig is "erected" when the "rig is jacked up and its legs are resting on the OCS, even temporarily," while the pipe-lay barge, which only drops anchors to stabilize its position, is not erected on the OCS similar to the tenders in *Longmire* and *Parks*.  *Id.*  However, Judge Clement's statement that  " 'for a rig or platform to be a federal enclave in international waters, it must be 'erected' upon the [OCS, and that] OCSLA does not apply to vessels that float on water" is at odds with the reasoning of *Demette*.  *Id.*  The jack-up rig as a mobile, floating rig, may be an OCSLA situs when attached (legs "jacked" down) to the OCS, but *Demette* never explicitly held that vessels floating on water could not be OCSLA situses as Judge DeMoss carefully critiqued. *See* 280 F.3d at 498-89.

In *Diamond Offshore Co. v. A&B Builders, Inc.*, the Fifth Circuit in reviewing a motion for summary judgment considered whether a semi-submersible rig was an OCSLA situs under the *Demette* test.  302 F.3d 531 (5th Cir. 2002).  The Court inferred that the semi-submersible at issue in that case was attached to the seabed "by its drilling mechanisms" after being towed to its ultimate location.  *Id.* at 545.  Due to insufficient summary judgment evidence showing that the *Ocean Concorde* was "connected to the ocean floor" at the time of the incident, to determine whether the location qualified under the second *Demette* situs test, however, the court never reached the issue.  However, the court suggested what evidence might be sufficient to show that the semi-submersible rig is "erected" on the OCS: "anchors, drilling mechanisms, and flooded columns, displacement hulls, or caissons, that connected the rig to the seabed and supported the drilling platform."  *Id.* at 546.  Defendants seize upon the language "supported the drilling platform" in arguing that OCSLA 1333(a)(1) requires the installation or device to be "supported

by" ("erected") on the OCS.  The court in *Diamond Offshore* lists "flooded columns, displacement hulls, [and] caissons," all of which support the rig by keeping it afloat.  In light of its inference that the rig was attached via its drilling mechanisms, applying defendants' interpretation of this suggested list of evidence contradicts the court's earlier conclusion.  Moreover, the court's requested supplement of evidence is merely dicta.

Another district court decision determined that a semi-submersible rig that was tethered to the OCS was attached to the OCS and was not a "vessel" for purposes of the Jones Act. *Moore v. Big Salamis, Inc.,* 748 F.Supp.2d 598 (E.D. Texas Sept. 20, 2010).  The *Thunder Horse* was a semi-submersible drilling rig of the type that was tethered to the seafloor: "It is connected to the sea floor 6,000 feet below by a complex mooring system along with various pipelines and other drilling equipment that extend downward from the platform into the Outer Continental Shelf." *Id.* at 600.  However, unlike most semi-submersible rigs, the *Thunder Horse* was not capable of the "regular and extensive" movement that characterizes semi-submersibles with no system of self-propulsion.  *Id.* at 607-08. The court held that because of the "extensive attachment to the ocean floor and long-term commitment to a single location" the Thunder Horse was considered a work platform permanently attached to the seabed and not a Jones Act vessel. *Id.* at 608.  In addition, the court stated without further analysis that "it is undisputed that the Thunder Horse is attached to the Outer Continental Shelf and is engaged in the exploration, development, or production of mineral resources therefrom"; therefore, the court concluded that the *Thunder Horse* fell within OCSLA's jurisdictional grant under Section 1333(a)(1).  *Id.* at 609.

In a similarly succinct fashion, one recent district court decision concluded that the *Deepwater Horizon* itself was an OCSLA situs for purposes of 1333(a)(1), albeit without

applying the *Demette* situs test in full.  *U.S. v. Transocean Deepwater Drilling Inc.,* 2013 WL 1345246 (S.D. Texas, March 30, 2013).  In *Transocean Deepwater Drilling Inc.*, the court held that the *Deepwater Horizon* was "clearly connected to the [OCS]….by marine riser, meeting the situs requirement of § 1333(a)(1) [citation omitted]"  *Id.* at *5-6.

The issue of vessel status of semi-submersibles presents the converse of the OCSLA situs issue: vessel status concerns the mobility of the structure while OCSLA concerns the structure's fixedness and ability to be "erected" on the OCS.  *Transocean* and *Moore* reach the conclusion that a semi-submersible—the *Deepwater Horizon* itself—could meet the requirements of Section 1333(a)(1), and *Diamond Offshore* suggests that that a showing of connectedness through the semi-submersible's drilling mechanisms may be sufficient to reach such a conclusion.  Applying the reasoning set forth in *Demette*, a dynamically positioning semi-submersible rig may be an OCSLA situs under 1333(a)(1) when in position to drill and not merely anchored.  In light of the 1978 Amendments to OCSLA and Fifth Circuit precedent, this Court finds that the *Deepwater Horizon,* when connected and attached to the OCS through its drilling mechanisms and is performing exploration and production of mineral resources, is "erected" on the OCS for the purposes of Section 1333(a)(1).  Because OCSLA Section 1333(a)(1) extends federal laws and political jurisdiction to the *Deepwater Horizon*, there is a jurisdictional basis for the charges brought against the defendants under Section 1112 and Section 1115.  Therefore, the Court will not address the defendants' alternative argument for jurisdiction under 18 U.S.C. §7.  Finding that OCSLA provides a jurisdictional basis for the charges brought against the defendants, the Court will now turn to the second issue regarding the application of Section 1115 to the defendants.

## III.     SHIP OFFICERS' MANSLAUGHTER

Having decided that a jurisdictional basis exists to charge the defendants with Ship Officer's Manslaughter under Section 1115, the Court must now consider whether, as defendants' contend, Section 1115 applies to the defendants, Messrs. Kaluza and Vidrine. Section 1115, colloquially called the "Seaman's Manslaughter" statute[55] and entitled "Misconduct or neglect of ship officers," provides that "[e]very captain, engineer, pilot, or *other person employed on any steamboat or vessel*, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed…shall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C §1115 (emphasis added). The issue turns upon whether the defendants are "other persons employed on any…vessel" within the meaning of Section 1115.

Defendants argue that the statutes phrase "other person employed" does not clearly include the defendants; under principles of statutory construction, they propose that such "other persons" include only those positions of "responsibility or the marine operations, maintenance, and navigation of the vessel." (Rec. Doc. 52, at 8). Therefore, the defendants, as WSLs having no function related to the navigation of the *Deepwater Horizon*, are improperly charged under Section 1115. More particularly, the defendants interpret the phrase to apply to those persons employed in a marine-related capacity as opposed to some other employment capacity, such as a WSL in charge of drilling. In opposition, the government contends that the phrase "other person employed" clearly includes WSLs such as the defendants, and no further statutory analysis is necessary. Because the phrase is unambiguous, according to the government, the Court need not—indeed, it should not—analyze the meaning of the phrase under principles of statutory

---

[55] *See* William Pitard Wynne, *Seaman's Manslaughter: A Potential Sea of Troubles for the Maritime Defendant and a Clever Mechanism for Taking Arms Against the Slings and Arrows of Maritime Plaintiffs*, 50 LOY. L. REV. 869, 876 (2004).

construction.  (Rec. Doc. 68, at 12).  Thus, the government alleges that the defendants are properly charged under Section 1115.  (Rec. Doc. 68, at 13).

> ### A.        *Statutory Construction*

To assess the validity of the parties' arguments as to the proper interpretation of Section 1115, the Court, as always, must begin with the text of the statute.  *See Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981).  If the intent of Congress is "clear and unambiguously expressed" by the language of the statute, "that would be the end of [the Court's] analysis."  *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.,* 550 U.S. 81, 93, 127 S. Ct. 1534, 1543, 167 L. Ed. 2d 449 (2007) (citing *Chevron*, 467 U.S., at 842–843, 104 S.Ct. 2778).  Indeed, if the text is plain, the Court's sole function is to enforce the terms of the statute as written.  *Lamie v. U.S. Trustee,* 540 U.S. 526, 124 S.Ct. 1023, 157 Led.2d 1024 (2004); *In re Amy Unknown*, 701 F.3d 749, 759 (5th Cir. 2012), *cert. granted in* part, 13 S.Ct. 2886 (U.S. 2013).  Thus, when construing the text of the statute, the Court must begin with assumption that words have their ordinary meaning.  *INS v. Elias-Zacarias*, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992).  If the text of the criminal statute proves "opaque or translucent, or even merely ambiguous," however, the Court may employ canons of statutory construction, including a resort to legislative history and the rule of lenity.  *United States v. Barlow*, 41 F.3d 935, 942 (5th Cir. 1994); *see Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (applying canons of construction as "guides that 'need not be conclusive'" but are designed to determine legislative intent).

As other courts have noted, this archaic criminal statute's language somewhat "inartfully" expresses Congress' intent.  *See United States v. Mitlof*, 165 F. Supp. 2d 558, 562 (S.D.N.Y. 2001) ("[Section 1115 is] not the most artfully drafted statute, and employs somewhat archaic

phraseology.").  Nevertheless, interpreted according to their ordinary meaning, the terms of the statute—"every," "other," "person," "employed," "any," and "vessel"—pose no obstacle to understanding.  The government elaborates on this point by defining all but one ("other") of the terms in the phrase.  (*See* Rec. Doc. 68, at 13).  Yet courts should not only consider "the bare meaning of the word [or words] but also its placement and purpose in the statutory scheme. [T]he meaning of statutory language, plain or not, depends on context."  *Bailey v. United States*, 516 U.S. 137, 145 (1995).  It is in context that the parties' arguments illustrate the statute's ambiguity.

Both interpretations advanced by the parties are reasonable: the term "other person" could mean *all* persons employed on the vessel, as the government contends, or, within the context of the phrase, it could include some amount less than all persons.  Defendants contend that the context of the statute permits the use of the principle *ejusdem generis* to interpret the phrase "other person employed."  The government argues that the use of *ejusdem generis* is not warranted and argues that Congress included the list of persons preceding the phrase out of an abundance of caution to ensure their inclusion.  Given the clear discrepancy in the interpretations advanced by the parties, the Court is inclined to find that the Section 1115's phrase "other person employed on any…vessel" is ambiguous and statutory construction of the phrase appropriate. As the Supreme Court has stated, "[a]mbiguity is a creature not of definitional possibilities but of statutory context."  *Brown v. Gardner*, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d. 462 (1994).

### 1. Ejusdem Generis

In light of this ambiguity, the canons of statutory construction—and, in particular, *ejusdem generis*—aid the Court in understanding the meaning of a general term following a list

34

of specific terms.  *See Circuit City Stores v. Adams*, 532 U.S. 105, 114-15 (2001) (applying

*ejusdem generis* were general words follow specific words in a statutory enumeration).

> The Fifth Circuit has explained when the use of *ejusdem generis* is appropriate:

> > When general words follow an enumeration of persons or things,
> > such general words are not to be construed in their widest extent,
> > but are to be held as applying only to persons or things of the same
> > general kind or class as those specifically mentioned. That rule is
> > one of limitation, restricting general terms, such as "any other" and
> > "and the like," which follow specific terms, to matters similar to
> > those specified. *See, e.g.*, *United States v. La Brecque*, 419 F.Supp.
> > 430, 434 (D.N.J.1976).

*Hilton v. Sw. Bell Tel. Co*., 936 F.2d 823, 828 (5th Cir. 1991).  The doctrine of *ejusdem generis*

"warns against expansively interpreting broad language which immediately follows narrow and

specific terms."  *United States v. Insco*, 496 F.2d 204, 207 (5th Cir. 1974).  The Fifth Circuit has

also observed that this "limiting principle . . . has particular force with respect to criminal

statutes," which must be construed strictly.  *Id.*  Nevertheless, in applying *ejusdem generis*, the

Court must not use the canon to "eviscerate manifest legislative intent," *Insco,* 496 F.2d at 207,

or create ambiguity where none exists, *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 219

(5th Cir. 2007) (declining to employ the canons where the court would be "injecting ambiguity

into an otherwise unambiguous term").

> For example, a disjunctive phrase with one specific category and one general category

does not lend itself to interpretation under the rule of *ejusdem generis*.  *See Ali v. Federal Bureau

of Prisons,* 552 U.S. 214, 225, 128 S.Ct. 831, 839 (2008).  Where a phrase is a list of specific

items separated by commas and followed by a general or collective term, however, the use of

*ejusdem generis* generally is appropriate.  *See, e.g.*, *Wash. State Dep't of Soc. & Health Servs. v.

Keffeler,* 537 U.S. 371, 384-85 (2003); *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486-

87, 126 S. Ct. 1252, 1257, 163 L. Ed. 2d 1079 (2006); *Robinson v. Shell Oil Co.*, 519 U.S. 337,

341, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997); *Ali,* 552 U.S. at 225 ("The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase.").  The Court agrees with the defendants that this case presents a "textbook *ejusdem generis*" scenario.  (Rec. Doc. 81, at 5). The phrase "other person employed" follows a listing of more than one specific type of employment: captain, pilot, and engineer.  Indeed, at least one court has recognized the potential ambiguity in the phrase "other persons employed" when addressing the statutory interpretation of the term "captain" in Section 1115:

> Admittedly this is not the usual case where ejusdem generis is employed to interpret the general term. Here the question is not who is an "other person employed"; rather it is whether that term limits the definition of "captain" to captains employed on vessels engaged in commercial activity. In effect, the maxim is employed in the converse.

*United States v. LeBrecque*, 419 F.Supp. 430 (S.D.N.J. July 27, 1976) (citations omitted).  In this case, the phrase at issue presents the "usual case," precisely referred to by *LeBrecque*, in which courts should employ the familiar maxim.

Having established the appropriateness of *ejusdem generis* in construing the statutory phrase, the Court must determine what "common attribute" or class of persons the phrase implies.  *See Ali,* 552 U.S. at 225; *Northwestern Nat. Ins. Co. v. Dade County*, 461 F.2d 1158, 1164 (5th Cir. 1972) ("Under the rule of ejusdem generis . . . the general words should be restricted in application to matters, things, or persons of the same class as those that are particularly described.").  The defendants assert that the listed categories in Section 1115 involve positions of responsibility for "marine operations, maintenance, and navigation of the vessel." (Rec. Doc. 52, at 8).  In construing the residual phrase "other persons employed" according to the common attribute or similar process as the listed terms, defendants argue that WSLs are not

persons who have marine operations, maintenance, or navigation responsibilities. (Rec. Doc. 52, at 9). The defendants suggest that the WSLs were part of the "drill crew" as opposed to the "marine crew," who was responsible for marine operations, maintenance, and navigation of the vessel. (Rec. Doc. 52, at 4).

On the other hand, the government suggests that the Court should not adopt the defendants' interpretation of the common attribute, as the phrase "employed on any…vessel" already limits "other person" to only those persons who are employed on a vessel and any further limitation would displace Congressional intent. (Rec. Doc. 68, at 22). Further, the government argues that if *ejusdem generis* applied, the only common attribute among captains, engineers, and pilots is simply "employment on a vessel." (Rec. Doc. 73, at 25). The government supports this contention by examining how captains and engineers have duties unrelated to marine operations. (Rec. Doc. 73, at 26). The government notes that as WSLs, the defendants were responsible for complying "with BP's health, safety, security, and environmental requirements" under BP's Drilling and Wells Operation Practice manual. (Rec. Doc. 68, at 9). As WSLs, according to the government, the defendants "held positions of enormous authority onboard the rig." (Rec. Doc. 68, at 10). Thus, the government compares captains and engineers to WSLs who, "though their employment on a vessel, hold in their hands the safety and well-being of those on board." (Rec. Doc. 68, at 11). Yet the government fails to discuss the addition of the term "pilot" and the pilot's relative duties on a "vessel." It seems that in the context of the phrase, the terms "captain," "pilot," and "engineer," do suggest a class of important persons dealing with the function and navigation of the vessel.

### 2.      *Ex Abundanti Cautela*

The government argues, on the other hand, that the list of terms does not suggest a kind or class of persons but rather Congress mentioned the persons "captains, pilots, and engineers" to ensure their inclusion out of an abundance of caution.  (Rec. Doc. 68, at 22) (citing *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, , 121 S.Ct. 1302 (Souter, J., dissenting) (Congress may include specific examples before general language out of an abundance of caution)).  In other cases, the Supreme Court has found that Congress had special reasons for including a specific term along with a general term out of an abundance of caution (*ex abundanti cautela*) which should not be read *ejusdem generis.  See Adams*, 532 U.S. at 140  (Souter, J., dissenting); *Ali,* 552 U.S. 214; *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 44 n.5, 103 S.Ct. 2218, 2223, 76 L.Ed.2d 400 (1983).

At issue in *Adams* was a phrase in the Federal Arbitration Act excluding from the Act's coverage "contracts of employment of seamen, railroad employee, or any other class of workers engaged in foreign or interstate commerce." 532 U.S. at 105.   In *Adams,* Justice Souter in his dissent opined that the Court should have interpreted the phrase "seamen, railroad employee, or any other class of workers engaged in foreign or interstate commerce" as one where *ejusdem generis* was not appropriate and was an example of where Congress had a "special reason for emphasizing specific examples of a statutory class [negating] any inference that an otherwise unqualified general phrase was meant to apply only to matters *ejusdem generis*."  532 U.S. at 140.  Justice Souter and the majority suggested that Congress included seamen and railroad employees in the phrase because Congress had already legislated on those subjects; nevertheless, Justice Souter did not find that Congress' "act of special care" in including those subjects warranted interpreting the phrase *ejusdem generis* to exclude subjects not targeted by special

38

legislation. *Id.* Therefore, Justice Souter concluded that the FAA should exempt all employment contracts and not only those for "transportation workers," as the majority held. *Id.* at 140, 105.

In *Ali,* the Court found that the phrase "any officer of customs or excise or any other law enforcement officer" did not limit "other law enforcement officers" to those acting in a customs or excise capacity. 522 U.S. at 226. The Court noted that construing the phrase broadly did not necessarily render it superfluous, surmising that Congress may have intended to "remove any doubt that officers of customs or excise were included in 'law enforcement officers.'" *Id.*

In *Watt*, the Supreme Court did not apply *ejusdem generis* to determine whether the phrase "coal and other minerals" included all inorganic substances or only those, like coal, with a "definite chemical composition." 462 U.S. at 44. Because the existing law treated coal differently from other minerals, exempting it from the applicability of general mining laws, the Court noted that Congress likely used the term "coal" for the specific reason of ensuring its inclusion. *Id.* at n.5. In addition, the House Report reflected that the phrase "coal and other minerals" was once "all minerals," suggesting the inclusion of coal was exceptional. *Id.*

As applied to the facts *sub judice*, however, the argument *ex abundanti cautela* is unavailing. A common feature of the argument is that it applies in cases where a statutory word or phrase could be read broadly or in a more limited fashion. The argument offers an explanation for interpreting a term or phrase broadly in spite of the inclusion of specific terms arguably subsumed within the broad term or phrase. It is the converse of ejusdem generis and generally contradicts the rule against superfluities. *See* Ali, 552 U.S. at 226; *Adams,* 532 U.S. at 138. If the Court were to apply the argument in this matter, the phrase "other person employed" would be read broadly to include *all* persons employed and the mention of captains, pilots, and

engineers was merely cautionary to ensure their inclusion.  The application of this argument seems inappropriate for several reasons.

Common sense suggests that if Congress was concerned about the inclusion of "all" persons employed, it would have simply said so.  While the phrase "every…other person employed" might suggest a broad reading similar to using the term "all," the phrase still falls within the context of an enumerated list of persons.  Such a broad reading of "other persons employed" would expand the scope of the term and subsume the specific terms "captain," "engineer," and "pilot" within "other persons employed," rendering the specific terms meaningless and violating the rule against superfluities.  *CSX Transp., Inc., v. Ala. Dep't of Revenue*, 131 S.Ct. 1101, 1113, 179 L.Ed.2d 37 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless.").  Unlike *Ali*, by the plain meaning of the words in Section 1115, there is little doubt that a person "employed" on a vessel could include a captain, engineer, or pilot.  Further, the cases aforementioned are distinguishable from the instant matter: the statutes involved in those cases were not criminal. Including technically unnecessary examples and a general catchall phrase out of an abundance of caution becomes suspect in the context of a criminal statute.  As with arguments concerning vague language in criminal statutes, the government's broad construction of the phrase risks running afoul of substantive due process requirements by failing to convey with fair notice which persons might be included within the statute's ambit.[56]

In determining whether Congress had a specific intent to include the specific enumeration in Section 1115, however, a resort to legislative history is necessary.  The Court in *Watt*

---

[56] *See Insco*, 496 F.2d at 208.  *See also United States v. Mitlof*, 165 F. Supp. 2d 558, 562 (S.D.N.Y. 2001) ( "[S]ome ambiguity in a statute's meaning is constitutionally tolerable[, and] every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." (citations omitted)).

determined that law applicable to coal informed Congress' decision to specifically mention it in the statute.  462 U.S. at 44 n.5.  In *Adams*, the majority did not employ Justice Souter's reasoning and instead applied *ejusdem generis*; the Court considered Congress' "demonstrated concern with transportation workers," finding that the phrase was applicable to other "transportation workers" which explains "the linkage to the two specific, enumerated types of workers identified."  532 U.S. at 121.  Indeed, the instant matter very closely parallels the issue in *LeBrecque,* where the court applied the principle of *ejusdem generis* and determined that Section 1115 did not apply to a "captain" of a non-commercial, as opposed to a commercial, vessel. 419 F.Sup. 430 (D.N.J. 1976).  That the court in *LeBrecque* inferred from canons of construction and legislative history that the statute only applied to captains of commercial vessels is instructive; this Court likewise may infer a limitation applying *ejusdem generis* and an examination of legislative history.  In this case, the Congressional intent evidenced by the legislative history and the case law interpreting Section 1115 show no such intent to ensure inclusion of the specifically listed occupations "out of an abundance of caution."  Indeed, the history shows Congress' intent to limit "other persons employed" *ejusdem generis* to those persons with some responsibility relating to the marine operations, maintenance, or navigation.[57]

### B.    *Legislative History and Case Law*

As previously stated*,* this Court notes that legislative history may be used to divine Congressional intent.  *See United States v. Barlow*, 41 F.3d 935, 942 (5th Cir. 1994); *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001).  A resort to legislative history proves

---

[57] The Court notes that while the defendants argument that *noscitur a sociis* provides further support for their argument that "other persons employed" does not include the defendants, the Court finds that this canon may not be appropriate for an interpretation of a general, residual phrase in a list following specific items and not a single term in isolation to be interpreted with the others surrounding it. *See In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 218 (5th Cir. 2007) ("Under the canon of noscitur a sociis, a term is interpreted by considering the meaning of the terms associated with it.").  Thus, in the Court's opinion, the canon of *ejusdem generis* sufficiently addresses the ambiguity presented by this phrase.

particularly useful when the words of the statute might produce "an unreasonable result 'plainly at variance with the policy of the legislation as a whole,'" and the court may choose to follow the policy of the statute. *United States v. Scrimgeour*, 636 F.2d 1019, 1023 (5th Cir. 1981) (citing *United States v. American Trucking Assns*., 310 U.S. at 543-44, 60 S.Ct. at 1063-64 (footnotes omitted)).   The Fifth Circuit has stated the following:

> The strict construction principle governing interpretation of criminal statutes "cannot provide a substitute for common sense, precedent and legislative history." *United States v. Standard Oil Co.*, 384 U.S. 224, 225, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). The canon that penal statutes should be strictly construed "is not an inexorable command to override common sense and evident statutory purpose." *United States v. Cook*, supra, 384 U.S. at 262, 86 S.Ct. at 1414, quoting *United States v. Brown,* 33 U.S. 18, 25, 68 S.Ct. 376, 379, 92 L.Ed. 442 (1948).

*United States v. Scrimgeour*, 636 F.2d 1019, 1023-24 (5th Cir. 1981).

No court has addressed the applicability of Section 1115 in a prosecution related to a drilling rig blow-out in the statute's 175-year history.  Congress enacted the predecessor to Section 1115 in 1838 in response to a very specific recurring problem: to "provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam." Act of July 7, 1838, ch. 191, 5 Stat. 304 (1838).  At the time Congress enacted the 1838 Act, steamboat travel was common and steamboat collisions and boiler explosions were regular occurrences. *United States v. O'Keefe*, 2004 WL 224574 (E.D.La. Feb. 3, 2004); *In re Charge to Grand Jury*, 30 F. Cas. 990 (E.D.La. 1846) (noting the "frequent loss of human life in consequence of explosions of the boilers of steamboats" and "the burning of steamboats"); *United States v. Warner,* 28 F. Cas. 404, 408 (D.Ohio, 1848).  One judge observed that "there is no subject connected with our western commerce more vitally interesting to the country," *United States v. Taylor,* 28 F. Cas. 25, 31 (D.Ohio, 1851), while another lamented that

"[s]carcely a day passes but we receive intelligence . . . that life has been destroyed by the recklessness . . . of those having charge of our railroad locomotives and steamboats." *United States v. Collyer*, 25 F. Cas. 554 (C.C.S.D.N.Y. 1855).  Thus, the 1838 Act included provisions tailored to the prevention of collisions, fires, and other safety measures.  *See United States v. Ryan*, 365 F.Supp.2d 338, 344 (E.D.N.Y. April 22, 2005).  The Act itself also criminalized the conduct of "every captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam" who negligently caused the death of persons onboard.  *Id.* (citing Act of July 7, 1838, ch. 191, 5 Stat. 304 (1838)).  The degree of negligence for those persons, however, was intentionally lowered from that of other manslaughter statutes, in part due to the inherently dangerous nature of operating a wooden vessel filled with "combustible materials."  *Van Shaick v. United States,* 159 F. 847, 851 (2d. Cir. 1908) ("So the master of a wooden vessel filled with combustible materials and thronged with hundreds of irresponsible human beings is required to exercise a greater degree of watchfulness."); *see* Wynne, William and Brian Ballay, *Seaman's Manslaughter: A Potential Sea of Troubles for the Maritime Defendant and a Clever Mechanism for Taking Arms Against the Slings and Arrows of Maritime Plaintiffs*, 50 Loy. L. Rev. 869, 896 (Winter 2004) (noting that Section 1115 case law indicates courts use a lower standard than other manslaughter statutes).  Despite enacting the1838 legislation, however, explosions continued to occur.  *Ryan*, 365 F.Supp.2d at 344.

Congress continued to pass more comprehensive steamboat regulations in response to the continuing disasters.  *Id.* at 345.  In 1909, Congress enacted the present form of the statute, which is identical to the prior form with the exception of the addition of vessels other than steamboats, "reflecting technological developments." [58]  As of 1948, when Congress revised and

---

[58] *See* Act of Mar. 4, 1909, 60th Cong., ch. 321, s. 282, 35 Stat. 1144; *LeBrecque*, 419 F.Supp. at 435; *see also United States v. Holmes*, 104 F. 884, 886 (C.C.N.D. Ohio 1900) ("The primary rule in the construction of statutes is

reenacted the criminal statutes, the title "Misconduct or neglect of ship officers" was added. Pub. L. No. 772, 80th Cong., 2d. Sess., 62 Stat. 683, 757 (1948).

Throughout its history, the case law applying the statute reflects the intent of Congress in passing the statute: to hold accountable those persons responsible for the marine operations and navigation of the vessel.[59]  For example, the Judge in *In re Charge to Grand Jury* stated that the statute "was designed to punish the captains, engineers, and pilots of steamboats for their negligence or inattention."  30 F. Cas. 990, 991 (E.D.La. 1846).  The commonality among the case law is that those persons charged under Section 1115 were those persons with some responsibility for the navigation or operation of the vessel; the statute's "design was to enforce the greatest possible vigilance and caution on the part of those concerned in steamboat *navigation*."  *United States v. Warner*, 28 F. Cas. 404, 408 (C.C.D.Ohio 1848).  Thus, the statute was directed toward those who "assume the solemn responsibility of transporting persons and property from one port to another." *In re Charge to Grand Jury,* 30 F. Cas. at 991; *see also*

---

that, if possible, their meaning is to be gathered from the language used, and it is never to be assumed that congress or any other legislative body did not understand exactly what they were doing when they made so important a change in the law. And we cannot escape the conclusion that, in making this change in the statute, the congress intended to extend the terms of the statute to include not only steam boats or vessels, or vessels propelled in whole or in part by steam, but any steam boat or vessel on the navigable waters of the United States.")

[59] *See United States v. O'Keefe,* 426 F.3d 274 (5th Cir. 2005) (captain); *United States v. Oba,* 317 Fed. App'x. 698 (9th Cir. 2009) (captain); *United States v. Thurston,* 362 F.3d 1319 (11th Cir. 2004) (chief officer); *United States v. Hui,* 83 F.3d 592 (2d Cir. 1996) (captain); *United States v. Hilger,* 867 F.2d 566 (9th Cir. 1989) (captain); *Hoopengarner v. United States,* 270 F.2d 465, 469-70 (6th Cir. 1959) (pilot); *United States v. Abbott,* 89 F.2d 166, 167 (2d Cir. 1936) (predecessor statute) (captain, chief engineer); *Van Schaick v. United States,* 159 F. 847 (2d Cir. 1908) (predecessor statute) (captain); *United States v. Holtzhauer,* 40 F. 76 (C.C.D.N.J. 1889) (predecessor statute) (captain; pilot); *United States v. Beacham,* 29 F. 284 (C.C.D. Md. 1886) (predecessor statute) (captain); *United States v. Keller,* 19 F. 633 (C.C.D.W.Va. 1884) (predecessor statute (pilot); *United States v. Farnham,* 25 F.Cas. 1042 (C.C.S.D.N.Y. 1853) (predecessor statute) (captain); *United States v. Taylor,* 28 F. Cas. 25 (C.C.D. Ohio 1851) (predecessor statute) (engineer); *United States v. Collyer,* 25 F. Cas. 554, 554 (C.C.S.D.N.Y. 1855) (predecessor statute) (captain, pilot, engineer, captain's clerk, owner);*United States v. Warner,* 28 F. Cas. 404 (C.C. Ohio 1848) (predecessor statute) (captain, first mate, second mate, and wheelsman);*United States v. Freeman,* 25 F. Cas. 1208 (C.C.Mass. 1827) ("master"); *United States v. Schroder,* 2006 WL 1663663 (S.D. Ala.) (captain); *United States v. Ryan,* 365 F. Supp.2d 338 (E.D.N.Y. 2005) (pilot); *United States v. Mitlof,* 165 F.Supp.2d 558 (S.D.N.Y. 2001) (captain, owner); *United States v. LaBrecque,* 419 F. Supp. 430, 437 (D.N.J. 1976) (captain of non-commercial vessel); *United States v. Vogt,* 230 F.Supp. 607 (E.D.La. 1964) (pilot); *United States v. Meckling,* 141 F.Supp. 608 (D.Md. 1956) (captain); *United States v. Harvey,* 54 F. Supp. 910 (D.C. Oregon 1943) (pilot); *United States v. Doig,* 4 F. 193 (D. Cal. 1880) (predecessor statute) (pilot); *United States v. Knowles,* 26 F.Cas. 800 (N.D.Cal. 1864) (predecessor statute) (captain).

*Taylor*, 28 F. Cas. at 26 ("[E]very one who assumes to perform certain duties, as captain, pilot, or other responsible duty on board a steamboat, is made responsible."); *O'Keefe*, 2004 WL 224574 at *4 ("[Section 1115 applies to] *all* persons, regardless of . . . whether the offender had any unique responsibility or fiduciary duty towards the victim of the crime.").  The statute's title also lends credence to the conclusion that "other persons employed" are those with some position of authority, such as the officers.[60]  Indeed, the government agrees that "captains and engineers hold positions of authority and have responsibility, to differing degrees, for the safe operation of the vessel in its core function."  (Rec. Doc. 68, at 26).  However, the government argues that the case law history evidences the fact that "other persons employed" has included those other than persons with "marine" employment functions or positions of responsibility.  (Rec. Doc. 68, at 18).

After review of cases applying Section 1115 from the time of its enactment, no case describes a defendant who does not perform some marine-related function.[61]  The government relies heavily on a single case in which a captain's clerk was charged to support their contention that "other person" has been interpreted to mean those persons having non-marine related duties. *United States v. Collyer*, 25 F. Cas. 554, 554 (C.C.S.D.N.Y. 1855); (Rec. Doc. 68, at 18).  The prosecution in that case claimed that "if the *officers* on board the vessel that day had performed their duty" then the accident would not have occurred, recognizing that those charged were considered "inferior officers" under Section 1115.  *Id.* at 567, 565 (defense counsel referred to "inferior officers" including the clerk); *see United States v. Warner*, 28 F. Cas. 404 (C.C.D. Ohio

---

[60] *Almendarez-Torres v. United States,* 523 U.S. 224, 234 (1998) (stating that the title and heading of a statute are tools available for resolving doubt about the statute's meaning).  *See U. S. v. Warner*, 28 F. Cas. 404, 407-08 (C.C.D. Ohio 1848) ("It may not be improper here to remark, that the title of the act of congress, and the circumstances leading to its passage, are significant of the purposes of its enactment, and throw light upon its true construction. It is entitled, 'An act to provide for the better security of the lives of passengers on board of vessels, propelled in whole or in part by steam.'")
[61] *See supra*, note 55.

1848) (charging first and second mates in addition to captain).  Again, as shown by *Collyer,* the

common thread among all of these persons who are not specifically listed in the statute is their

function: they are in some degree responsible for duties they must discharge to transport

passengers on a vessel.[62]  In other words, their duties—regardless of the degree of import—*are*

marine-related.

     *Collyer* also stands alone among the other cases applying Section 1115 as it is the only

case charging the captain's clerk, who was the "captain's assistant" also in charge of "collecting

of fare and giving tickets"  *Id.* at 578 (defense counsel's description).  In a later case, deciding

not to extend Section 1115 to captains of non-commercial vessels, the *LeBrecque* court remarked

that while a prior case "implicitly sanctioned the prosecution of a pleasure boat owner, it

seem[ed] to represent an unwarranted (and perhaps unintentional) extension of the statute."  419

F.Supp. 430, 435 (D.N.J. 1976) (discussing *Hoopengarner v. United States*, 270 F.2d 465, 469-

70 (6th Cir. 1959)). The court did not find *Hoopengarner* persuasive in light of the purpose and

legislative history of the statute.  *Id.*  Likewise, this Court fails to consider this single opinion

from 1855 dealing with a steamboat racing accident very persuasive in light of the strong

evidence from other case law, legislative history, and the purpose of the statute.[63]

     The government argues, however, that even the captain and the engineer have non-marine

related functions, which suggests that "marine operations or navigation" may not be the limiting

characteristic applied to "other persons employed."  (Rec. Doc. 68, at 27).  To the contrary, cases

often recognize the various and important duties of a captain, who generally "is charged with the

---

[62] *United States v. Taylor*, 28 F.Cas. 25, 30 (C.C.D. Ohio 1851) ("Congress, by legislation on this subject, have endeavored to add somewhat to the security of passengers in traveling upon steamboats. They may not have done all that could be done by legislation.")

[63] Moreover, this Court doubts the decision of the 1855 *Collyer* court in denying the motion to quash the indictment for insufficiency in joining the defendants "occupying different stations of employment on the steamboat, for a joint misconduct….without showing that their acts were jointly destructive" when the 1838 statute did not contemplate such "joint negligence" through its "disjunctive or distribute" phrases. 25 F. Cas. 554 (C.C.S.D.N.Y. 1855)

responsibility for the right performance of *all duties* which appertain to the command and management of the propelling power of the vessel." *United States v. Farnham*, 25 F. Cas. 1042, 1044 (C.C.S.D.N.Y. 1853) (emphasis added).  The government cites captain's duties such as "accounting," yet cases note that the captain may be held responsible for the actions of those under him simply because he is responsible for hiring capable officers.  (Rec. Doc. 68, at 26).

The government also claims that the engineer may be responsible for maintenance of mechanical operations having nothing to do with maritime navigation similar to duties on land. (Rec. Doc. 68, at 26).  The understanding at the time predecessor to Section 1115 was passed contradicts the government's interpretation.  Engineers were those with specific knowledge of the boiler systems and were responsible for the functioning of the boilers, which provided the sole power for locomotion to the steamboats: "[t]here is no situation which requires a more accurate knowledge of the power of steam . . . than that of engineer on board a steamboat." *United States v. Taylor*, 28 F.Cas. 25, 30 (C.C.D. Ohio 1851). They were specifically mentioned in the first place because of their involvement in navigation and their responsibility for boiler explosions.  *Id.*  It is worth noting that the captain, pilot, and engineer of a steamboat traditionally worked together—along with other crew members—to operate the vessel.  *See United States v. Farnham*,  25 F. Cas. 1042, 1044 (describing the duties of captain, engineer, and pilot).  Similarly, the *Deepwater Horizon* maintained a "marine crew" responsible for navigation as well as a separate "drilling crew." [64] The dynamic positioning officers were part of the marine crew, which included a captain and first mate.[65]  More importantly, a Crew Data report labels the "Marine Crew" of the *Deepwater Horizon* as having the following persons: Chief Engineer, Able Bodied Seaman, Senior Dynamic Positioning Officer, Master/OIM/Ballast Control, Chief

---

[64] *See* excerpts from March 4-5, 2013 MDL Oil Spill trial testimony of Mr. Ezell, at pp. 1637-38.
[65] *See* excerpts from March 4-5, 2013 MDL Oil Spill trial testimony of Mr. Ezell, at pp. 1637-38.

Mate/Ballast Control, Dynamic Positioning Officer II Third Mate, etc.[66]   These positions
comprise the type of crew Section 1115 describes in its listed categories of "captain," "pilot,"
and "engineer."  To extend the scope of "other persons employed" to reach well site leaders and
other employees of the drilling crew reaches beyond the intended scope of the statute.

Moreover, unlike *Adams* and *Watts*, the legislative history and case law exhibit no
express reason for including the specific listing of terms out of an abundance of caution.  Instead,
the history reflects Congress' decision to hold those persons responsible for navigating the vessel
accountable for their actions.  Applying this common attribute, the defendants, as WSLs and part
of the drilling crew, would not be considered "other person[s] employed" on the vessel under
Section 1115.  The government argues that excluding the defendants from the scope of "other
persons" leads to absurd results: while a captain or chief engineer of the *Deepwater Horizon*
might be charged under Section 1115 for resulting deaths of a blowout, the defendants would not
be liable for the same conduct.  (Rec. Doc. 68, at 23).  The government's argument is inapposite.
By the same token, a well site leader aboard a fixed platform not considered a vessel would
never face liability under Section 1115, while a well site leader aboard a floating platform
"vessel" would face liability under Section 1115 (in addition to other applicable law).  Far from
absurd, the result conforms with Congressional intent.

In divining Congressional intent, the Court should take into account the intent of
Congress at the time the legislation was enacted.  *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 64
(1983) ("In construing a congressional act, the relevant intent of Congress is that existing at the
time the statute was enacted.").  The legislative history and case law surrounding Section 1115

---

[66] *See* excerpts from March 4-5, 2013 MDL Oil Spill trial testimony of Mr. Ezell, at pp. 1637-38; United States
Coast Guard, *Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking and Loss of
Eleven Crew Members Aboard the Mobile Offshore Drilling Unit Deepwater Horizon in the Gulf of Mexico, April
20-22, 2010*, Appendix D, p. D-3 and D-4.

make clear that its purpose is to curb negligent acts leading to death by those performing a marine operational or navigational function on vessels, particularly to steamboats.  Thus, the government is correct that, in theory, dynamic positioning officers,[67] who are "captains" or other marine-related employees of the *Deepwater Horizon*, may be held liable under Section 1115. The Court recognizes the soundness in the government's argument that oil rig blow-out pose similar risks and safety concerns as did the steamboat explosions of the 19th and 20th centuries. (Rec. Doc. 68, at 15).  The risk of explosion onboard deepwater drilling facilities is a grave matter.  Yet, it is for Congress to include such types of disasters within the scope of Section 1115, and this Court refuses to expand the scope of the statute unnecessarily without certainty as to Congress' intent to do so.

### C.      Rule of Lenity

As to any remaining doubt regarding the interpretation of "other persons employed," this Court employs the rule of lenity, the "familiar principle that criminal statutes are to be construed strictly in favor of the defendant."  *LeBrecque,* 419 F.Supp. at 436 (citing *Smith v. United States,* 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959)); *United States v. Santos*, 553 U.S. 507, 514 128 S. Ct. 2020, 2025, 170 L. Ed. 2d 912 (2008).  The rule of lenity is one of the three manifestations of the constitutional requirement that criminal statutes should provide fair warning of the boundaries of criminal conduct.  *See, e.g.*, *Crandon v. United States*, 494 U.S. 152, 158, 110 S. Ct. 997, 1001, 108 L. Ed. 2d 132 (1990); *United States v. Bodmer*, 342 F. Supp. 2d, 181 (S.D.N.Y. 2004) (citing *United States v. Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 1225, 137 L. Ed. 2d 432 (1997)).  While some statutes are "ambiguous," the rule of lenity applies only in the narrow circumstance when "after seizing everything from which it can be derived,

---

[67] *See* Rec. Doc. 54-2, at 9-11 (Exhibit 1), excerpt from March 13, 2013 Oil Spill MDL trial testimony of Geoffrey Webster. (stating that the two "dynamic positioning officers" who are "on watch 24 hours a day," must maintain the vessel's position "just using the propulsion, the thrusters" applying power "to bring it back into position").

[the court] can make no more than a guess as to what Congress intended." *Muscarello v. United States*, 526 U.S. 125, 138, 118 S. Ct. 1911, 1919, 141 L. Ed. 2d 111 (1998). Indeed, the rule is one that is used to resolve an ambiguity and "not to be used to beget one." *Callanan v. United States*, 364 U.S. 587, 596, 81 S. Ct. 321, 326, 5 L. Ed. 2d 312 (1961). Thus, "[t]he mere possibility of articulating a narrower construction [ . . .] does not by itself make the rule of lenity applicable." *Smith v. United States,* 508 U.S. 223, 239, 113 S. Ct. 2050, 2059, 124 L. Ed. 2d 138 (1993).

 The rule should be applied after an analysis of the statutory language that attempts to discern what Congress expressed or intended to express. *Callanan v. United States*, 364 U.S. 587, 596, 81 S. Ct. 321, 326, 5 L. Ed. 2d 312 (1961). In addition, the Court in *Crandon v. United States* stated that "[i]n determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158, 110 S. Ct. 997, 1001, 108 L. Ed. 2d 132 (1990)(citing *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987). 481 U.S. 41, 51 (1987)). Then, where analysis the language or history of a statute does not illuminate Congress' intent, the rule of lenity may be used to resolve the "ambiguity in the ambit of the statute's coverage." *See Crandon v. United States*, 494 U.S. 152, 158, 110 S. Ct. 997, 1001, 108 L. Ed. 2d 132 (1990). In resolving the ambiguity, the "longstanding principles of lenity" demand that the statute be interpreted in the defendant's favor. *Hughey v.United States*, 495 U.S. 411, 422, 110 S. Ct. 1979, 1986, 109 L. Ed. 2d 408 (1990).

The object and policy of the statute suggest that "other persons employed" includes only those persons involved in marine operations or navigation. This more lenient interpretation of "other persons employed" complies with a narrow interpretation under *ejusdem generis* as well as favors the defendant. Without further indication from Congress evidencing any intent to expand the scope of "other persons employed," the Court finds that the defendants as WSLs are not "other persons employed" under Section 1115. Thus, the indictment fails to charge the defendants under Section 1115.

Accordingly,

**IT IS ORDERED THAT** Defendant Kaluza's Motion to Dismiss Counts 1-22 (Rec. Doc. 51), joined by Defendant Vidrine is **DENIED**, and Defendant Kaluza's Motion to Dismiss Counts 12-22 (Rec. Doc. 52), joined by Defendant Vidrine and Defendant Vidrine's Motion to Dismiss Counts 12-22 (Rec. Doc. 54) are **GRANTED.**

New Orleans, Louisiana, this 10th day of _____December_____, 2013.

_____
**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT JUDGE**